Theodore Olson on behalf of the appellant and across FLE. I would like to reserve seven minutes for rebuttal. The court, please. May it please the court. Plaintiffs cannot escape the fact that this case is all about reducing prices. The injunction that the court below issued tells it all. The injunction prohibits discounts relative to market penetration, linked to market penetration. That is what the court below decided. And plaintiffs can't prevail in this case because Eaton's prices were never below Eaton's costs. That was never disputed and never proved otherwise. The plain, simple, and unavoidable fact is that the plaintiffs failed in this business because they could not or would not meet Eaton's above-cost prices. And what good does the injunction do to the plaintiffs if they're not in the business? It is meaningless. In fact, the judge said so at the point of granting the injunction. The judge said she said that this injunction is not going to do the plaintiffs any good. They will have no direct benefit of this. But I'm going to go ahead and issue the injunction because of the possibility that they might someday reenter the market. But there was no evidence that would support the proposition that was any real probability to enter the market. So, Your Honor, the point is there might be some benefit to the consumer, but that's not the standard for the... which says you are prohibited from linking discounts to market penetration goals or anything like that. You're telling the defendant you can't reduce prices which the consumers wanted, the purchasers wanted. So not only would this judgment... this judgment would affect the consumers, and that's the way I was answering your question, but it would not benefit the consumers. It would certainly not benefit the plaintiffs in this case, and the injunction is therefore unjustifiable. There is a standing question. There is an Article 3 question. There is just simply not, under these circumstances, no Article 3 standing to issue this injunction. There is no irreparable injury. There is no concrete, specific, imminent risk of harm to the plaintiffs. And therefore, there's an Article 3 question in addition to the antitrust standing question. The very language that the judge used in the first sentence by saying that there's no possibility, there's very little possibility that there would be any direct benefit to the plaintiffs as a result of this injunction, answers the question. That injunction cannot be sustained on the basis of that factual record. Now we also think that it's very, very important in this case that the motion for a judgment as a matter of law should have been granted. Under this court's decisions, under the decisions in many circuit courts that have considered comparable facts, there is no justification for proceeding with an antitrust complaint. The Supreme Court is virtually unanimous on very, very few things, as we know, but on this issue in the Weyerhaeuser case, in the language that all the court agreed upon in the Linkline case, going back to the Brook Group case, lowering prices is a good thing for consumers. And when people are in competition and they want to develop a mechanism so that they can sell as many of their products as possible by linking their ambition to the reduction of prices, that is a good thing. And as the Supreme Court has said, it is very damaging, as long as those prices are not predatory, as long as they're above cost. The Supreme Court has said, if it's a pricing case, there's no question that this is a pricing case. That's what the judge's injunction did specify. And that's what the district judge said the hammer was in this case. It's all about pricing. The plaintiffs definitely attempted to call it something other than what it was, and they wanted to avoid the law that I was talking about. But the fact of the case, the guts of the case, the gist of the case, the core of the case, is what was the hammer, that's what the district judge called it, was the offer of reducing prices if you purchased a certain percentage of your needs from the department. No, you do not want to acknowledge that it was an exclusive deal. Because the original equipment manufacturers, the customers for these products, could purchase from the plaintiffs any time they wanted. Nothing in these agreements, and I think you'll see this on page, the Joint Appendix 9 and 10, the judge specifically said, these were not exclusive dealing arrangements because at all times, the purchasers of these products, the consumers of these products, at all times could buy from the plaintiffs. And at all times, the plaintiffs could sell their products to the original equipment manufacturers. So there was no exclusivity. What there was, was an incentive to buy from the most efficient competitor. But are you using the term consumer interchangeably with the original equipment? You're not using it in terms of all the trucks. Well, the purchasers of the trucks specified that they would buy from the plaintiffs at all times. This is a little different than walking in, you know, a person would be selling a car, a person buying a new car. That's correct. That is a very important distinction. I was going to make that if I had time. They did not have to give that choice. I mean, ultimately, the builders of the trucks wanted, because the market was collapsing, to make it as efficient as possible with respect to the sales. I wonder if all the purchasers of the trucks were very sophisticated purchasers. That's absolutely true. The record is very clear that not only were the original equipment manufacturers sophisticated, powerful, and no pushovers. If this was something that was forcing something down their throat, they wouldn't have accepted it. And the purchasers of the trucks are generally sophisticated, large purchasers of trucks, and they were doing the best that they could, and they were benefiting from this process. So what the Supreme Court said in connection with this, not only are low prices advantageous, but we don't want to penalize or put people in a situation where they can't figure out what the rule is with respect to the pricing of their products. In the most recent decision, I think it was the Linkline case, the Chief Justice speaking for the court said lawyers have to be able to explain these things to their clients. There have to be clear rules. There have to be clear rules because we have to know what damage has been done by the allegedly improper practice. That's one reason. Secondly, because we don't want to discourage low prices. And thirdly, we do not want to have inefficient competitors to use the antitrust laws as a protection so that they can raise prices above efficient levels. Now, in this situation, the records replete with evidence that the plaintiffs in this case could have reduced their prices. They were asked to reduce their prices from time to time. They did not do so. Eaton was making sufficient profits with respect to these prices, but was doing the best it could to capture as much of the market as it could. Understandably, that's what we expect competitors to do. The plaintiffs in this case were simply not willing to reduce their prices to be at a competitive level. But the judge wasn't charging the jury something in return for a lot of money. What did the judge tell the jury to stand for? In other words, when the jury was deliberating, they had to say, the plaintiff proved this. Yes, and the jury instructions didn't focus on price cost at all. That never got to the jury. It shouldn't have gotten to the jury because the price cost test, the Supreme Court says, if you're pricing above cost, and unless the plaintiff proves a dangerous probability that those costs will be recovered later on in higher prices, this case never should have gone to the jury. But the jury must have been given something and had to find the five items. We don't challenge the instruction because the instruction doesn't instruct with respect to a standard that violates the antitrust laws. This court, in the race tire case, specifically said exclusive arrangements are even to be encouraged because you want competitors to go out and try to do this. But the fact is, certainly these prices were sufficiently attractive that the OEMs wanted to purchase from the attractive competitor. I thought myself that, well, you weren't challenging the instructions, so in a sense, it really didn't matter what you were saying in the book. This case couldn't get to the jury. This case should have been brought out. which is what should have happened here. The fact is that you cannot violate the antitrust laws if you're pricing above cost and you don't demonstrate, if you're the plaintiffs, that there's a dangerous probability of recoupment of those costs. This case did not even come close to meeting those standards. It should have been dismissed. No, I don't think so. I think it unquestionably is a pricing case and you can look at the injunction because that's the only thing the judge focused on. But if it isn't a pricing case, it is something in the ether as making your opportunities to your customers sufficiently attractive that they'll only do business with you. That's why the plaintiffs kept calling it an exclusive dealing case. But the contracts on their face were not exclusive. But we do have more than an injunction. We have the record in the case and you, who were judges in that law, and we have the jury instructions in the case. So we have a lot more. Even if there's a defect in the injunction, and that wasn't very well thought given the injunction, it doesn't appear that it became part of a reconsideration motion. So one could argue that the injunction isn't tailored. It doesn't address the issues, the range of issues that the injunction has to issue. Well, my point was that's what the judge thought the case was. That's what the plaintiff's lawyers said when they argued in favor of the admissibility of their expert witness. The expert witness referred to it as the incentive, which was driving the whole thing. The judge referred to the pricing as the hammer. So what I'm saying, Your Honor, is this unquestionably was a pricing case because that was the only thing that provided the incentive. That was the core of what provided the incentive. This is a good question. I know the time is up. This is purely, obviously, a hypothetical. Let's assume that we thought that the jury's verdict, that it should be overturned based on the judgment of the matter of law, and we're left with the information regarding the injunction and the fact that there was no damage hearing because the other information relative to the expert, the opposing party, was not allowed. What would happen in that context? What would you suggest? Well, I would say that I think I understood your question. If you determined not to overturn the jury verdict, and if you left the damage resolution in place, which I think the evidence amply supports, this witness didn't know what he was doing with respect to damages and eliminated the injunction, we'd accept that outcome. But I think as a matter of law, from this court, with respect to antitrust, it would be very unsatisfactory because it would send the message that you cannot induce consumer loyalty with price reductions. And that's the antithesis for the antitrust laws. Okay. Mr. Wilson, thank you. We'll have you back in a minute. May I stop? Thank you, Your Honor. Jay Fastow for the plaintiff's CF Meritor and Meritor Transmission. Now let's spend a few minutes on the actual record here. And one point quickly on the injunction. As you all will recall, we are cross-appealing on the injunction because the district court wouldn't listen to our position on the scope of injunctive relief. So I don't think that the scope of the injunction indicates the district court's view of the case, especially when you look at the district court's decision on the judgment as a matter of law motion that Eaton made, which the district court rejected. And the district court there recognizes that there is much more here beyond the agreements. I thought this was high enough for me, but sometimes I have that issue. So that when you look at the JOMOL decision, you see the district court itself recognized this case is much more than the market share rebates Eaton talks about and continually is the only thing it wants to talk about. I think importantly here is that no matter how it tries, Eaton can't turn this into a case of an inefficient competitor that was defeated by the workings of pricing competition. In particular, at joint appendix pages 1495 to 96, Eaton's own economist, Professor Murphy, conceded at a trial that it's reasonable to consider plaintiffs an equally efficient competitor of Eaton. That's 1495 to 96. And in fact, plaintiffs were in a key way a more efficient competitor than Eaton because they had the advanced two-pedal Freedomline product. And that was in a category, the automated mechanicals, that both plaintiffs and Eaton recognized was about to grow dramatically because of its benefits. And yet Eaton wasn't going to have an analog to the Freedomline for years. Equally, Eaton can't avoid the recognition, talking about the Supreme Court cases, that it didn't win a battle of consumer choice by offering consumers a better deal. What it did was use its monopoly power over the OEMs to deprive the consumers, the fleets, the mom-and-pop truck buyers, deprive them of their traditional choice of transmissions and block them from access to a better product, the Freedomline. Now, if you read Eaton's briefs, as we all did, it repeatedly calls its rebates, quote, modest. I think seven times in its two briefs it says that. So it must mean that. But then its Professor Murphy made another major concession. This is at Appendix 1497, the very next page, where he testified that, quote, such small, such small rebates wouldn't exclude a competitor. And plaintiffs, of course, were a competitor that had a better product and, as Eaton conceded, a very formidable partner, ZF Friedershausen. So Eaton didn't stop. Eaton just wants to talk about rebates. But it didn't stop with even its market share rebates. In contrast to the Weyerhaeuser case, Eaton cites, they talked about, quote, unilateral pricing measures.  Eaton used its monopoly power to engage in an array of non-unilateral, concerted action with the OEMs that even it can't claim just represents price competition or even represents price competition at all. And Eaton just refuses in its opening brief and its reply brief and, again, in argument, it refuses to even acknowledge the existence of these facts. So this is not a case where a seller goes to a customer and say, if you voluntarily decide to buy more from me, I will give you a better price. What this case is about and why we call it exclusive dealing, Eaton was saying, I'm a monopolist and you four OEMs, you know it. And you will, not may, you will buy all of you, virtually everything from me. And you will do so for five to seven to ten years until any trace of any significant competition is long gone. And that's why not only do we submit that our claims are appropriate under the cases we've cited, we submit that our claims are a fortiori to the claims and the cases that we've cited like Densply and LePages. And importantly here in contrast to 3M and Brook Group and Densply and, I'm sorry, 3M and LePages and Dennis LeVay and Brandon Williamson and Brook Group, Eaton didn't have the most advanced product. It was in a position of being a long time monopolist that was about to be leapfrogged by a new and very strong ZF competitor. But it did have monopoly power, which it doesn't contest on appeal. And this wasn't just the monopoly power over transparent tape in the caverns of a Walmart or a Target. Obviously not good for Walmart, but hardly deadly to its business. Here Eaton had a chokehold on the very business of the OEM truck builders. If you didn't have a transmission, the one you wanted, when you needed it, at a competitive price, you couldn't make a sale. It's almost like the two of you would argue in separate cases. Mr. Olson argues whatever – try to get him to agree that you call this an exclusive viewing case. I think he's sort of agreed with that. But he argues that no matter what you call this, there has to be a price-cost analysis. And the Supreme Court has said unless you're below the cost, unless your pricing is predatory, that you can't sell. Why is he not correct? Because what the Supreme Court is talking about in Brook Group and Weyerhaeuser are pricing practices. As Weyerhaeuser called it after Brook Group, unilateral pricing measures. And that's not this. Because what we had here was not, as I said, the if-then. Think of Brook Group. In Brook Group you had someone with 11 or 12 percent. So they weren't a monopolist. They went to their wholesalers and said, look, we'll offer you a better price if you buy more. They had discounts and volume rebates. That's not what happened here. Because – and in fact Eaton's argument plays right into this. Eaton says that at least for a while our market share with the OEMs went up. Because people wanted the Freedom Line. Because of all its advantages, even though the Freedom Line was a much higher-priced product than basic manual transmission, people wanted that product. So Eaton didn't stop with saying, gee, if you buy more from me, even if you buy 92 percent from me, I'll give you a better price. But that's it. What Eaton said is, you will buy this from me. And that's why it went to the whole array of conduct. Why do you say, you will? Because Eaton was ready to sell it to anyone who wanted it. Well, but that was a concern, Your Honor, of the OEMs. And you see it, fear of retaliation, fear of maybe I won't get my deliveries on time, maybe I won't get the products I want, maybe I won't get the same price as my competitors. You see the fear of the OEMs. For example, Volvo. Volvo was an OEM. Also made a small percentage of its own transmissions. Eaton's power was so strong that it forced Volvo to agree that it would price its own transmissions noncompetitively to Eaton's transmissions, Eaton-Volvo's own trucks to Volvo's own competitors. They forced them into this price-fixing agreement that Volvo said, okay, because I need you so much, I will disadvantage my own products in favor of your products. Eaton went to PACCAR. And PACCAR, it said, this is with respect to the performance transmissions, and it's joint appendix 2647 to 48. Eaton said, don't you forget that you have a big percentage of your sales are what they call performance trucks, on-off road construction trucks, logging trucks, those kinds of things. Not only am I a monopolist overall, but I am the only source of supply for those products. And that's the difference here, is that Eaton didn't just let it be as to whether the OEMs decided to buy more or not more. They came in and said, what we're going to do, and there's one more point, and I think Your Honor adverted to this earlier, is the importance of the truck buyers. Historically, this market ran on what was called a spec basis, as you saw that term, meaning the truck buyers could specify the components of their truck. The trucks, you had the data book, and you could say, I want this transmission, and these brakes, and these axles, and these seats, and so forth. And what Eaton did was it conspired with the OEMs, it used its muscle over the OEMs to block the truck buyers' choice. And let's talk about things, and we'll see whether we think this is price competition. Well, that's how the trucks work. That was exactly how the trucks work, until Eaton said, now OEMs, we're going to enter into a partnership, where you're going to block visibility, block accessibility of the truck buyers to competitive products. That was exactly how it was until Eaton said, no more, because they couldn't deal with the Freedom Line. No, they wanted only placement. For example, Mr. Klein's testimony at Appendix 261 to 273 explains how the Freedom Line, which was a product Eaton didn't have an analog for, disappeared from the OEM data books, because Eaton said, I want that out. At a higher price, because they were charging price penalties for transmissions that weren't standard in the data book. See, it's a whole combination of factors. The Freedom Line would be installed by the truck builder in the truck. I don't think there's anything in the record about truck buyers just buying the transmissions directly and installing them. What happened was Eaton closed off, there were four places we could sell to, four OEMs, and they closed off every one of them from five to seven to ten years, and they said, what we will do is we will want you to take them out, take our product out of the data book. Now, how is that possibly pro-consumer when Eaton doesn't even have an analog? It's not a preference. It's just we want you to disappear. And then we'll have them impose price penalties, resale price penalties, so that if somebody comes in and says, I like that Freedom Line, you have to say, you OEM, have to say that I'm going to charge you more. And they were penalties, no doubt about it. Council says that Eaton wanted these rebates passed along. There is no evidence of that. In fact, you can look at every one of those LTAs. There is nothing about passing along these rebates. And we cited in our brief evidence showing that Eaton knew, for example, for Freightliner, that it was not being passed along. They say that our rebates are not getting down to the field level. So these were penalties that were imposed, not only on us, by the way, but also on Volvo, as I said. Eaton got Volvo to penalize its own transmissions. They penalized our transmissions. Yes, sure. What they're saying they did was essentially Eaton came along and said, look, we have a trust for our AC transmission. But, you know, the more you buy, particularly over a certain percentage of your total transmissions within a year, we're going to be able to do better. But nowhere in the record does the better say that it's below their costs. Let me answer that in three ways, if I might. Okay. And I guess my question is, you know, why is that in conflict with the Constitution for us to evaluate these cases? And why is that a violation of the Constitution? Because it's not this case. And when your Honor says we're talking about different cases, you're absolutely right. In Eaton's opening brief, they said nothing about all this other conduct, the taking us out of the data book, the taking trucks with our transmissions out of sales packages and sales promotions, refusals to quote residual values on trucks with our transmissions, resale price penalties. They said nothing about that. And we said at the beginning of our statement of facts, basically, we're sorry we're going to have to spend a lot of time on this, because they didn't tell you what this case is about. And then if you look at their reply brief, they still don't deal with data book exclusion, resale price penalties, and all the rest, on and on. Including, for example, PACCAR. PACCAR said, I'm going to impose a limit on the incentives that we could provide their truck buyers. How is any of that pro-consumer? Yes. If the case is only about, as the Supreme Court calls it, as Eaton calls it in its brief, pricing practices, as Weyerhaeuser talks about it, unilateral pricing measures. If all you had were unilateral pricing measures, and their pricing were above cost in all respects, then that would be one case. But it's not this case. Of course. Absolutely. Because here, you see, when Professor Murphy, when Eaton says that their rebates were modest, were such small rebates, what that's telling you is one or two things. One is they didn't want to sacrifice their current profitability by giving big discounts. Number two is what they're saying is they realized it wouldn't work because they didn't have the better product. In Brook Group, Brown & Williamson was attacked by a low-priced competitor, the generic cigarettes. In LePage's, 3M was attacked by a low-priced competitor, the private label tape guy, LePage's, right? So if you're attacked by a low-quality, low-priced competitor, you may say, okay, well, I'll respond by lowering our prices. But Eaton was in this position. This is a situation that none of Eaton's cases, in fact, none of our cases, deal with is when the monopolist didn't have the best product. And so lowering prices, as Professor Murphy said, this is 1497. He testified at trial. This would not have defeated the plaintiffs. Plaintiffs were driven out of the market, as two of the OEMs specifically and separately testified, stated. In retrospect, Eaton's conduct killed first ZF Maritore, the joint venture, and the Freedom Line, and then after three more years of trying, Maritore Transmission. So I think the short of it is it's just not the case. And Eaton's counsel again gets up at oral argument and says this is just about pricing. Still doesn't deal with all the other conduct that they needed to do. And what they did was they reached to the OEM and grabbed them by the throat and said you need me. I'm the monopolist, and I'm 100% of the performance transmissions, and I want you to block the truck buyers, the consumers, who may be sophisticated and may not be sophisticated. We didn't hear a record cite on how many are sophisticated and how many are not. We want you to block them from their traditional choice of transmissions, and we want you to block them even from the visibility of the better product, the Freedom Line, that Eaton didn't have and didn't have for years. All right. Mr. Vance, now let me direct you to another point. Sure. I think it's important to hear and important to hear your comments. Let's talk about damages for a second. Absolutely. Because you were able to get the court-allowed Mr. Duranis' testimony on liability, but precluded you from offering Mr. Duranis' testimony on the damages and denied your motion for reconsideration and your motion for clarification. Why was this important in this case? I was wrong all the way down the line on those points, Your Honor. Number one, on the original calculations of Dr. Duranis. Two reasons. He relied on a document called the November 2000 Strategic Business Plan of ZF Meritor. That document was admitted into evidence at trial with no objection. And all the cases show, the advisory committee notes show, the language of 703 shows that that alone is enough for the expert to be able to rely on it. That was the old-fashioned way to have the expert rely on it, 703 went and broadened the ability of an expert to rely on information by saying you can also rely on information that's reasonably reliable by experts. But the core basis in all the cases reported, Eaton doesn't cite a single case to the contrary. And it makes sense because if the information is reliable enough for me to show it to the jury, to read it to the jury, to argue it to the jury, then there's no reason it's not good enough for Dr. Duranis to rely on it for his calculations. Now Eaton says, well, there are two phases of trial here. It doesn't say why that matters. The Strategic Business Plan is already in evidence, and Eaton identifies no objection, meritorious objection, that it would have made if damages were part of the first trial that it couldn't have made otherwise. So just as a matter of law, the district court was wrong, the admissibility establishes usability by Dr. Duranis. But, of course, there's more. Then we go to the reliability to experts problem. And Eaton has no answer to this court's declaration in the pages that internal projections for future growth are an appropriate basis for estimating lost profits. And that makes a lot of sense, especially when you look at the evidence here, in terms of indicia of reliability. Here we have, as the record shows, experienced business people who are doing these plans for purposes of deciding how to manage their business. As Mr. Lewis testified, we do plans to decide how much to spend, whom to hire, what products to develop. There's no reason to think that they were kidding themselves, especially since this plan was six years before the litigation. So even Eaton doesn't argue that there was any litigation paid to the plan. And, in fact, we know that they were being very careful here because the document that Dr. Duranis used, the projections there had already been reduced twice because of recent adverse market developments. And the ZF Meritor board said, look, we don't want you to be over-optimistic. We want to make sure that you're not projecting too much, and therefore we're mismanaging our business, we're spending too much money, or whatever. And we also know that Eaton's own projections as to the growth of the automated mechanical segment that the Freedom Line was part of were enormous. They said in 2000-2001 that by 2004-2005 they expected that segment to be up to half the sales. So that fully supported our projections as to the potential growth of the Freedom Line. And then we had Dr. Duranis, who tested and retested. Absolutely, Your Honor. Under the language of Paoli, as soon as the district court's Daubert decision came out, we said, well, first of all, we were surprised by 703, which Eaton hadn't cited in the whole Daubert proceeding. And we said, look, as an alternative, if you don't like the data he used, but you do approve the methodology, which the district court did both in its Daubert decision and then in the decision on the motion for clarification. It later said the guy wasn't rejecting the methodology. Then we'll put in new data. Not new data, data that was already in his report in supporting materials. But we'll put it in instead of the strategic business plan data, and we should be on our way. But this report didn't allow you to do that. But why isn't that just a case-management decision you brought to the district court to get it out of the community? Your Honor, I think that under Paoli and Pennypack, what this court has been teaching is, you can imagine, we can all imagine, some egregious circumstances. But that wasn't the case here, especially where we weren't even on notice of a 703 exclusion possibility. What the district court said was I'm not going to give you another opportunity to modify your calculations. But in reality, what the district court wouldn't do is give us one opportunity to modify our calculations. It was one and done, based on what Paoli and Pennypack talk about as critical evidence, as we've discussed. Absent his ability to testify, the district court said we have no damages, which is, of course, very critical to us and critical to the public interest in the enforcement of the antitrust laws. And given the bifurcation, we said to the district court, please, let's work out the damages issue first, and then let's go to trial. And first, the district court was amenable to that, and then changed its mind and said, no, let's do a bifurcated trial, and maybe we'll never have to deal with damages. But having bifurcated, there was certainly no pressure. And the standard of Pennypack is incurable prejudice to the defendant. There is no prejudice, much less incurable prejudice, that now we've had almost three years since we said, okay, here are our alternative calculations. There's no damages-phased trial scheduled, so there's no prejudice, much less incurable prejudice. Thank you. I will try to be efficient. We've heard that the plaintiffs were an equally efficient competitor. They may have been an equally efficient competitor, but as I said at the very beginning, they were either unable or unwilling to meet the price reductions. So if they had the capacity to do it, to reduce their prices, they did not do that. We just heard that these rebates were not modest. They ranged from one-fourth of 1% up to 3%. Now, you could argue about whether they were modest or not, and they were cumulative based upon the overall demand for the products. But they were market share discounts based upon what the OEMs want. The record is clear that what was happening at that point in time is that the market was falling apart. Demand for trucks was cut in half during this period of time. So the OEMs themselves didn't want volume discounts. They specifically wanted to know that they would be able to meet the standard for the rebates by a market share discount. That benefited them, and also, Your Honor, that benefits the smaller competitor. The smaller OEM might not be able to match the larger OEMs with respect to total sales volume, but they can always match a market share discount. Fear of retaliation. I think that we heard a lot about that just a moment ago. These were powerful original equipment manufacturers. They had the power to determine whether they would accept these arrangements or not. Two of them made their own transmissions. With respect to retaliation itself, we've heard something about that, but it never happened. There was never any evidence there was actual retaliation or specific threats of, you don't do this, Eaton is going to quit selling transmissions. That doesn't make any sense. And they never did, and they never would have. They never retaliated. The problem that the plaintiffs face is that they did not want to reduce their prices. With respect to the question of whether these agreements were exclusive, as I cited from page 9 and 10 of the joint appendix, these are the words of the district judge. The long-term agreements were not, quote, were not exclusive. Each customer remained free to buy these transmissions from other suppliers, including ZFM. The incentives offered by Eaton were what each customer wanted. Now, that's very much like race tire. The competitor in race tire could have competed and did compete with respect to these exclusive arrangements and sometimes succeeded and sometimes didn't. Well, I think what you meant by exclusive was considered de facto exclusive. De facto exclusive. Well, furthermore, whether it's de jure or de facto, what this court said in race tires, it is well established, citing other cases, that competition among businesses to serve as an exclusive supplier should be encouraged. All right. Now, if it is either a de facto or a de jure, it wasn't a de jure exclusive agreement. There was no exclusivity at all. They could be terminated by the OEMs at any time. And the penalty, if they didn't reach the targets for share penetration, was they didn't get the rebates. It didn't say anywhere in there, we will cut you off with transmissions. Now, with respect to de facto exclusivity, the only thing that made them attractive to the OEMs was the price and the discounts. So we're talking specifically about discounting prices. With respect to whether we're talking about two different cases, we're not talking about two different cases. The plaintiffs want to call it exclusive dealing because they can't go anywhere near a price case. Because if they go near a price case, they didn't even try to put on evidence of the price-cost standard. As far as LePage is concerned, that was, as you know, a bundling case. It would involve totally different facts and other circumstances where the rival could not compete with respect to one of the products. I'm going to end on damages. The Doremus damage testimony, in the first instance, was based upon a one-page business plan. He didn't know whether it was the final or a draft. He didn't know who wrote it. He didn't test the factual assumptions in the SBP. And what the judge finally threw up her hands and said, this is on page 147 of the joint appendix, I frankly find his report the longest, densest, most confusing report I've ever had to deal with in my 18 years on the bench. Now, the judge was extremely conscientious with looking at whether the tests under 702, 703, we're talking about using reliable testimony, that shouldn't have been a surprise to anybody if you want to qualify an expert. The material upon which the expert purported to base his testimony was not reliable. He didn't even know who wrote it. Now, with respect to the bifurcation point, should... That's correct. That's correct. And I'm just saying that if on the unlikely possibility that you disagree with us on that. What happens with respect to certainly... Pardon me? Yes, yes, I fully understand that. It's happened to me. With respect to that, then you might go to the damage point. The judge was perfectly right with respect to both the bona fides and the standards under the rules of evidence with respect to this evidence, with respect to this witness's understanding of what he was talking about with respect to this. As far as reopening the case was concerned, the judge went to great length. She insisted on the discovery order and the order of trial and the preparation. She specifically said, now, if I do that... Furthermore, you had the alternatives damage theories before you didn't do them. We talked about this in limine. The discovery period is past. I'd have to reopen discovery. I'd have to do expert reports. In other words, she was managing a difficult case responsibly and sensibly. It would have been a lot better if she thought to do that before the trial started. Well, there's always a way that you can find... Every district judge certainly knows that the procedure, especially in an involved complex case like this, can have ways in which you could look back and say it's done better, but she gave them every opportunity. At the end of the day, this case is about above-cost discounts. There's no evidence that there's any discounting below cost. No evidence of predatory prices. No evidence of possibility of recoupment. We're talking about powerful competitors in the marketplace. Thank you, Your Honor.